Roy F. Hall, Appellant, v. Rodney I. Putney and Helen Putney, Appellees.

Gen. No. 9,207.

Heard in this court at the May term, 1937. Opinion filed June 30, 1937. Rehearing denied October 7, 1937.

HALL & DUSHER, of Rockford, for appellant.

FRANK E. MAYNARD, of Rockford, for appellees.

MR. JUSTICE DOVE delivered the opinion of the court.

The complaint in this case was filed August 7, 1935, praying for an injunction to suppress the continuance of an alleged nuisance. On November 21, 1936, a supplement to the complaint was filed. The defendants answered and the cause was heard by the chancellor in open court, resulting in a decree dismissing the com-

plaint for want of equity and the plaintiff brings the record to this court for review.

The nuisance complained of is a root beer stand which the defendants have been operating since July 27, 1931. The stand is equipped with a basement of cement blocks and the upper portion is of wood construction, the boards running parallel with the earth. It is approximately 12 feet square and the eaves extend out some four feet. There is a counter around the stand about four feet from the ground and above the counter the sides of the stand raise outward and are hinged at the top and when the stand is open for business, these sides are fastened at the top and all four sides are open. On top of the stand there is a sign upon which appears, "Putneys Ice Cold Root Beer, Barbecues, Hot Dogs, Ice Cream." On each side of the stand on the edge of the cornice there are two 60-watt electric lights and on top of the stand in reflectors pointing toward the sign are two 200-watt electric lights. The stand is supplied with gas and water and is operated from the beginning of warm weather in the spring, May or June, until cool weather in the fall; ordinarily about five months of the year. In addition to selling root beer, the defendants vend peanuts, candy bars, popcorn and sandwiches. Hamburgers and hot dogs are cooked as ordered, but the other meat used for sandwiches is not cooked at the stand.

The evidence further discloses that the plaintiff has a substantial, modern residence located on a five-acre tract at the intersection of Spring Creek road and North Second street road outside of the city limits of Rockford and has been living there since April, 1928. North Second street extends in a northeasterly direction and is a four-lane cement highway upon which a great deal of traffic passes. Spring Creek road runs east and west and is also a much traveled cement high-

way. The plaintiff's property lies directly to the east of and borders North Second street road and lies north of and borders Spring Creek road. One hundred feet east of the plaintiff's residence on the north side of Spring Creek road is the residence of J. H. Abramson and across Spring Creek road from the Abramson residence are the Homer Bliss and Edward Eisnor residences. North of the plaintiff's residence and on the same side of North Second street is the residence of Dr. Edward Weld and northeast of the plaintiff's residence is the home of Robert Gaylord, which is on the north side of the Spring Creek road. The property of the defendants is located on Lot Three of Shorewood Addition and this stand is 266 feet northeast of the intersection of the Spring Creek road and North Second street on the west side of North Second street and 250 feet west of the residence of the plaintiff. From the northeast corner of the intersection of Spring Creek road and North Second street, it is 350 feet to the southwest corner of plaintiff's residence. At the intersection of the Spring Creek road and the North Second street road is an automatic red, yellow and green traffic signal and the evidence is that it is a busy intersection. Some 600 or 700 feet west of the plaintiff's property is the Rock River running in a northerly and southerly direction. East of the river and between it and the plaintiff's property are the tracks of the Northwestern Railway Company and east of those tracks are the office building, garage, two storage warehouses, two lumber sheds and coal yard of the High Bridge Lumber Company and east of these and directly west of the defendants' property is the abandoned right of way of the Rockford and Interurban Railway Company. At the south end of the Lumber Company's property and facing Spring Creek road is a gasoline filling station and it is approximately 400 feet from the residence of the plaintiff. South

of the defendants' stand about 200 feet is another root beer stand which was operated in 1936. This stand is about 300 feet from the plaintiff's residence.

The customers of the plaintiff are chiefly those who come to the stand in automobiles. The stand opens for business about nine or ten o'clock in the morning and is kept open until midnight or shortly thereafter every day in the week, including Sundays. At the time the complaint was filed the family of the plaintiff consisted of himself, his wife and eight children, and at the time of the hearing consisted of himself, wife and seven children, one child having passed away on October 25, 1935.

The evidence further discloses that the plaintiff, his wife and members of the family had been disturbed by the bright lights from the stand entering the sleeping room of one of the children of the plaintiff and they had also been awakened by noise that came from the stand, such as the tooting of horns, the grinding of brakes, the starting of an automobile engine and the closing of automobile doors. The stand maintains curb service and when a car stopped the horn of the automobile was sounded and a waiter came to secure the order of the occupants of the car, and when those in the automobile desired to leave the horn of the automobile was again sounded and the waiter came to get the trays. Carl A. Nelson testified on behalf of the plaintiff to the effect that he was employed by the plaintiff and from a point 75 or 80 feet east of the stand, he observed on several evenings the number of cars which stopped at the stand of the defendants and upon those occasions made a notation of what occurred. For instance, he testified that on Saturday evening, July 27, 1935, between 9:00 p. m. and 12:45 a. m. there were 119 cars stopped at the stand; that frequently when the cars stopped the brakes squeaked and some cars did not have mufflers on them

and the usual noise accompanied the starting of the engines on the various automobiles. On Sunday night, July 28, 1935, Nelson testified that the stand closed at 12:30 a. m. and that 131 cars stopped at the stand that evening; that some of the cars blew their horns and that two of the cars had no mufflers and one had a radio that was turned on. On August 1, 1936, Nelson testified that from 9 o'clock until 10 o'clock 96 cars stopped and from 10 to 11 o'clock 75 cars stopped and from 11 o'clock to midnight 47 cars stopped and from midnight until one o'clock of the following morning 96 cars stopped.

It would serve no useful purpose to set forth in detail all the evidence in this record. The plaintiff and his wife testified about the noise, the odor caused from cooking meat and the light emanating from the defendants' stand, which forms the basis of this suit. In addition to their evidence and that of Mr. Nelson, to which we have referred, L. T. Ryder, a commercial photographer, was called as a witness and identified two photographs of the defendants' property taken on July 9, 1936. We have examined these photographs and others found in the record. Homer Bliss and Nellie Bliss, his wife, who live on the south side of Spring Creek road some 500 feet from defendants' stand, both testified on behalf of the plaintiff, Mrs. Bliss to the effect that the radio, lights and loud talking at the stand bothered her and Mr. Bliss to the effect that particularly on Saturday and Sunday he could hear the grinding of brakes, loud talking and the sound of a radio which disturbed him and the members of his family. J. H. Abramson, who lives about 100 feet east of the plaintiff, testified on behalf of the plaintiff and stated that he had planted considerable shrubbery to screen out the lights from the stand of the defendants and that when sitting in his yard on summer evenings, he was disturbed by the honking of horns, the screeching of brakes, the slamming of

doors and radio programs coming from the premises of the defendants. W. L. Taylor also was called as a witness for the plaintiff and testified that the view from the west window of the northwest upstairs room of the plaintiff's home to the defendants' stand was unobstructed and that in order to screen out the lights of the stand of the defendants, it would be necessary to use five tall evergreens which would cost about $250 to plant and insure their growth.

Twenty-one witnesses, including the defendants, testified on their behalf and the record of their testimony embraces 213 pages of the record. Many of the witnesses testified that they had been at defendants' stand at various times and upon those occasions there were no loud or unusual talking or noises of any kind and no loud or continued honking of horns or squeaking of brakes or slamming of automobile doors and that there was no radio at the stand during 1935 or 1936 except on two occasions, one of which was when the Lewis-Schmeling fight was broadcast and that as soon as this particular feature was concluded, the defendants returned their radio to their home. The evidence offered on behalf of the defendants further discloses that as automobiles proceeded over North End Bridge and turned from the east towards the north, that at night their headlights shone directly into and upon the plaintiff's property and upon and into his residence, that when automobiles, trucks and busses approached the intersection of Spring Creek road and North Second street road and were obliged to stop in obedience to the traffic signal there, that considerable noise was made from squeaking brakes and the honking of horns which could be distinctly heard at the defendants' stand 200 feet distant, and for a further distance than the plaintiff's residence. That automobiles also stopped and started at the other root beer stand conducted at this intersection the same as they did at the defendants' stand.

We have read the evidence as abstracted by counsel for appellant and as abstracted by counsel for appellees and have also examined the record and the several photographs and plat included therein. According to the testimony of some of the witnesses for the plaintiff, the defendants had a radio which was turned on broadcasting ball games every afternoon and was operated loudly every evening. This was denied by the defendants and from their testimony it appears that only upon two occasions and then for a short time only did they have a radio at their stand. Other witnesses testified that the only radio heard at the stand was an occasional one in some customer's automobile. A witness for the plaintiff testified that no lights from automobiles came into the plaintiff's residence as those automobiles crossed North End Bridge and turned north and east into North Second street road, but a number of witnesses for the defendants testified that they did. Mr. Ryder testified that when he was in the Hall residence for the purpose of taking a night photograph, which is in the record, he looked out of an upstairs window and saw cars crossing across the North End Bridge and turn north into Second street road and that their lights shone on the ceiling of the room where he was. The father of a boy who had been accused of shooting fireworks near the defendants' stand along in July, 1935, went upon the plaintiff's property and stood in the shrubbery about 75 feet away from the defendants' stand on three different evenings in July of that year. He testified that he remained there for some time, observed and heard what was going on at the defendants' place of business and his evidence was to the effect that there were no loud or unusual noises that could disturb anyone.

In *Phelps v. Winch*, 309 Ill. 158, the complainants sought an injunction restraining the defendants from operating a dance pavilion. In reversing the judg-

ment of this court and the decree of the circuit court and remanding the cause to the circuit court with directions to enter a decree enjoining the defendants from operating the pavilion in such manner as to interfere with the reasonable comfort and enjoyment of life by complainants and other persons of ordinary sensibility occupying their premises, the Supreme Court quoted from *First M. E. Church v. Cape May Grain & Coal Co.,* 73 N. J. Eq. 257, as follows: "While defendant is entitled to the enjoyment of its property in the pursuit of a lawful business, that business must be conducted with due regard to the well recognized rights of surrounding property owners. When such business becomes creative of conditions which clearly render the appropriate enjoyment of surrounding property impossible the rights of others are invaded, and equity will restrain the persistent pursuit of such injuries. . . . The law takes care that lawful and useful business shall not be put a stop to on account of every trifling or imaginary annoyance such as may offend the taste or disturb the nerves of a fastidious or over-refined person; but, on the other hand, it does not allow anyone, whatever his circumstances or condition may be, to be driven from his home or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity."

In *Off v. Exposition Coaster, Inc.,* 336 Ill. 100, the court affirmed a decree of the circuit court which restrained the defendants from operating a roller coaster, shooting gallery, tipsy house, a "dodgem," a dance hall, a merry go round, a cat's meow and other amusements near the dwellings of the plaintiffs. After reviewing the evidence, the court stated that in its opinion the noises described by the several witnesses would unquestionably affect the sensibilities of ordinary people in the enjoyment of their homes and held that a court of equity would enjoin a business

which is not a nuisance *per se* if the manner in which the business is operated seriously injures the premises of the complainants and interferes with the physical comforts of ordinary people.

In *Klumpp v. Rhoads*, 362 Ill. 412, the plaintiffs sought to enjoin the defendants from operating a gasoline, oil and ice service station in the vicinity of their residence. In holding that there was no sufficient testimony to show any substantial interference with the rest, comfort or privacy of the plaintiffs, the court said: "When a business creates conditions which clearly render the appropriate enjoyment of surrounding property impossible, the rights of others are invaded and equity will restrain the persistent pursuit of such injuries. If the damages are of a nature which can not be adequately compensated for in a suit at law, equity will afford relief by injunction. On the other hand, lawful and useful business may not be stopped on account of trifling or imaginary annoyances which do not constitute real injury. If the right to relief is doubtful, either as to the law or under the facts proved, equitable relief will not be granted." (Citing the *Off* and *Phelps* cases, *supra*.)

The facts in the instant case are clearly distinguishable from the facts in any of the cases herein referred to. The term nuisance extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency or obstructs the reasonable and comfortable use of property. 20 R. C. L. 380. The defendants' business is the vending of non-intoxicating beverages, confections and sandwiches. It has none of the objectionable features of a dance pavilion or an amusement park. The objectionable noise chiefly comes from the honking of horns, screeching of brakes, the starting of the engines and the closing of doors of automobiles, the occupants of which are customers of the defendants. Our sympathies are with the plaintiff and we have no doubt that at times the

conditions at and near the stand of the defendants are annoying to the plaintiff and his family and are such as to interfere with their full and complete enjoyment of their home; there is some conflict in the evidence, however, and we hesitate to substitute our judgment for that of the chancellor who heard the evidence in open court and who had an opportunity of observing the several witnesses who testified. Under a well established principle of law, this court, from all the evidence found in this record, would not be justified in disturbing his findings unless we felt that those findings were manifestly and palpably wrong. *Hall v. Pittenger,* 365 Ill. 135.

Inasmuch as the decree of the circuit court of Winnebago county will be affirmed, it is unnecessary for us to pass upon the motion of appellee to strike a portion of appellant's brief.

*Decree affirmed.*